**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITY OF NEW YORK,

              *Plaintiff/Counter-Defendant*,

     v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for Silicon Valley
Bank,

             *Defendant/Counter-Plaintiff*.

Civil Action No. 24-160 (SLS)

Judge Sparkle L. Sooknanan

## MEMORANDUM OPINION

The Federal Deposit Insurance Corporation (FDIC) insures bank depositors against losses and serves as a receiver for failed banks. This lawsuit is about the FDIC's ongoing receivership of Silicon Valley Bank, which was the largest regional commercial bank in San Francisco until it shuttered in March 2023 with a negative cash balance of $958 million. Shortly after it closed its doors, the FDIC assumed receivership of the Bank and began winding up its affairs. As part of that process, the City of New York sued the FDIC receiver to recoup the Bank's tax deficiencies from 2017 through 2021. The FDIC receiver then filed amended tax returns for the 2019–2021 tax period claiming a tax refund for subsequent operating losses incurred by the Bank. That amended return is currently subject to a routine audit by the City. In the meantime, the FDIC receiver also brought a counterclaim against the City seeking a refund of taxes paid by the Bank for the 2019–2021 tax period. The City moves to dismiss the counterclaim for lack of subject matter jurisdiction. Because the Tax Injunction Act prevents federal courts from exercising jurisdiction over matters like this one involving municipal tax administration, the Court grants the City's motion. This Court is simply not empowered to grant the FDIC receiver the municipal tax refund that it seeks.

## BACKGROUND

### A.        Statutory Background

### 1.        Equity Receivership

Traditionally, receivership is an interlocutory remedy in equity that "grew out of . . . the English Court of Chancery." Charles A. Wright & Arthur R. Miller, 12 Fed. Prac. & Proc. Civ. § 2981 (3d ed. Sep. 2025 Update). The remedy initially served to preserve real property throughout possession disputes, but it ultimately expanded to become a way to reorganize "the administration of the assets of corporations and other debtors" in financial distress. *Id.* In such cases:

> A receivership was commenced by a [plaintiff's] petition to the federal court . . . to appoint a receiver to take control of the corporate debtor's assets. [If granted,] [t]he receiver would take title to the assets, thereby stopping collection efforts by individual creditors. The receiver, while looking for a buyer for the assets, would continue to run the [corporation]. Eventually the creditors would be paid out of the proceeds of a foreclosure sale of the assets.

Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 Am. Bankr. Inst. L. Rev. 5, 22 (1995). The receiver would act as "a temporary trustee or fiduciary" who would "preserve and protect" the estate until creditors were satisfied or the property was otherwise disposed of by the court. *Gordon v. Washington*, 295 U.S. 30, 37 (1935). Today, the use of court-appointed equity receivers has been largely displaced by "bankruptcy practice and other statutory receiverships." Wright & Miller, 12 Fed. Prac. & Proc. Civ. § 2981 (noting that "Chapter 11 of the Bankruptcy Code" is a "linear descendant of the equity receivership . . . which still bears many of its distinctive features" (cleaned up)); Aadir A. I. Khan, *From Historical to Cutting-Edge: Equity Receiverships as a Tool to Resolve Mass Torts*, 172 U. Pa. L. Rev. 1667, 1670–71, 1675–87 (2024) (outlining the differences between receivership practice and modern bankruptcy).

2

### 2.    National Bank Act

"In 1864, Congress enacted the [National Bank Act], establishing the system of national banking still in place today." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007). Breaking from a period of banking "chartered, regulated, and supervised by the states," the Act provided for "a national banking system by empowering the Office of the Comptroller of the Currency (OCC) to issue federal bank charters." *Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694, 699–700 (10th Cir. 2025) (citing 12 U.S.C. § 27(a)); *see also Atherton v. FDIC*, 519 U.S. 213, 222 (1997). Since its enactment, the United States has had a "dual banking system," where "both federal and state governments are empowered to charter banks and to regulate the banks holding their respective charters." *Lacewell v. OCC*, 999 F.3d 130, 135 (2d Cir. 2021) (cleaned up).

The Act also established federal protections for bank creditors. *See U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 449 (1993); *Third Nat. Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 316 (1977). Importantly, the Act permitted the Comptroller of the Currency to put national banks into receivership. *See* Pub. L. No. 38-106, § 50, 13 Stat. 114 (June 3, 1864) (current version at 12 U.S.C. § 192). As later revised, the statute provided that "whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, in either case, appoint a receiver, who shall proceed to close up such association." Pub. L. No. 86–230, § 16, 19 Stat. 63 (June 30, 1876) (current version at 12 U.S.C. § 191).

The National Bank Act thereby established a specialized insolvency and restructuring regime for banks that remains impactful today. Under the Act, the receiver became "the statutory assignee of the" bank and, in that role, the receiver "represents both the creditors" and the bank throughout the pendency of the receivership. *Kennedy v. Gibson*, 75 U.S. (8 Wall.) 498, 506

(1869). "[T]he moneys collected by [the receiver] [we]re paid over to the comptroller, who disburse[d] them to the creditors of the insolvent bank." *Ex parte Chetwood*, 165 U.S. 443, 458 (1897). The National Bank Act's receivership model served as the foundation for modern federal statutory receiverships. *Cf. Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.* (*Coit*), 489 U.S. 561, 576 (1989) (citing *Bank of Bethel v. Pahquioque Bank*, 81 U.S. (14 Wall.) 383, 401–402 (1872)). And many of the National Bank Act's receivership provisions remain "currently codified without significant change" in federal law. Patricia A. McCoy, *et al.*, 2 Banks & Thrifts: Gov't Enforcement & Receivership § 12.02 n.1 (2024) (citing 12 U.S.C. § 192).

### 3.    New Deal Reforms

In response to the 1929 stock-market crash and the Great Depression, Congress enacted widespread legislation to "eliminate abuses in the nation's financial markets" and banking industry. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (*Merrill Lynch*), 756 F.2d 230, 237 (2d Cir. 1985). At the time, there were concerns that the selection of receivers had been politicized causing prolonged reorganizations, excessive costs, and harm to depositors and creditors throughout the reorganization process. FDIC, The First Fifty Years: A History of the FDIC, 1933-1983, at 83 (1984) ("Complaints were heard that receiverships, . . . had been 'doled out as political 'plums', the recipients of which attempt to make as much commission as possible, and to keep the job going as long as possible.'" (citation omitted)).

Congress enacted the Glass-Steagall Act or Banking Act of 1933 "to protect bank depositors from any repetition of the widespread bank closings that occurred during the Great Depression." *Bd. of Governors, Fed. Rsrv. Sys. v. Inv. Co. Inst.*, 450 U.S. 46, 61 (1981). The Glass-Steagall Act regulated and "curtailed the corporate powers of national banks." *Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 740 (D.C. Cir. 1986). It also "created the Federal Deposit Insurance

Corporation (FDIC) to insure bank depositors against loss." *Merrill Lynch*, 756 F.2d at 237. National banks were thereafter required "to purchase insurance from the FDIC." *Ortega v. OCC*, 155 F.4th 394, 405 n.15 (5th Cir. 2025).

In additional to its insurance responsibilities, Congress also charged the FDIC with "purchas[ing], hold[ing], and liquidat[ing] . . . the assets of national banks which have been closed by . . . the Comptroller of the Currency." Banking Act of 1933, Pub. L. No. 73–65, § 12B(a), 48 Stat. 162, 168 (1933). Congress made the Comptroller of the Currency one of the directors of the FDIC. *Id.* § 12B(b) (current version at 12 U.S.C. § 1812(a)(1)(A)). And Congress amended the National Bank Act to require the Comptroller of the Currency to appoint the FDIC alone as the receiver to liquidate or wind up national banks. Banking Act of 1935, Pub. L. No. 74–305, § 12B(l)(3), 49 Stat. 684, 694 (1935) (current version at 12 U.S.C. § 1821(c)(2)(A)(ii)).

Congress also enacted a similar statutory scheme to address the "heavy withdrawals from savings accounts, mortgage loan defaults, and limited funds for home mortgages during the depression." *Coit*, 489 U.S. at 568. Prior to the Great Depression, "savings and loan associations were chartered and regulated by the States alone." *Id.* But the Home Owners' Loan Act of 1933 and related statutes established the Federal Home Loan Bank Board "to organize, regulate, and charter federal savings and loan associations." *Id.* The Bank Board was also empowered to appoint a receiver for the "reorganization" or "liquidation" of these associations should they fail. *Id.* (cleaned up). In 1934, Congress passed the National Housing Act, which established the Federal Saving and Loan Insurance Corporation (FSLIC). *Id.* at 569. Like the FDIC, the FSLIC "insure[d] the accounts of all federal savings and loan associations" and served as the receiver for such associations should the Bank Board deem receivership necessary. *Id.*

5

Over the next five decades, Congress passed various enactments expanding the coverage and scope of these federal programs, creating "a complex statutory framework" of banking and commercial regulation across a series of statutes. *See id.* at 568–71.

### 4.    The Financial Institutions Reform, Recovery, and Enforcement Act

In 1989, Congress enacted "emergency legislation," the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), that reformed and consolidated our national banking regulatory structure to address the widespread insolvencies of financial institutions in the late 1980s and early 1990s. *Resol. Tr. Corp. (RTC) v. Diamond*, 18 F.3d 111, 113 (2d Cir. 1994) (quoting S. Rep. No. 101-19, 1st Sess. 3 (1989)), *vacated on other grounds sub nom. Solomon v. RTC*, 513 U.S. 801 (1994). At that time, the situation was dire:

> Between 1980 and 1994, 1,617 federally insured banks with $302.6 billion in assets were closed or received FDIC financial assistance. During this same time, 1,295 savings and loan institutions with $621 billion in assets also were either closed by the FSLIC or the [Resolution Trust Corporation], or received FSLIC financial assistance.

FDIC, Managing the Crisis: The FDIC and RTC Experience 4 (1997), available at: https://perma.cc/M47N-LHQF. The FSLIC "insurance fund was reported to be at minus $75 billion, and the ratio of losses to all insured deposits rose to 1.48 percent, a level that had only been exceeded in 1933." *Id.* Congress enacted the FIRREA to provide for "the orderly disposition of the assets of [such] failed institutions" through a more streamlined regulatory regime. *Diamond*, 18 F.3d at 113 (quoting H.R. Rep. No. 101-54(I), 1st Sess. (1989), *reprinted in* 1989 USCAAN 86, 104).

The FIRREA dissolved the FSLIC and transferred the responsibility of insuring deposits of savings and loan institutions to the FDIC alone. *See* 12 U.S.C. § 1821 note. The statute also expanded the power of the FDIC, allowing it to appoint itself as and act as the receiver for any insurance depository institution, including national banks and savings and loan institutions. *See id.*

§§ 1813(c)(2), 1821(c), 1822.[1] Congress also empowered the FDIC to act as the receiver of any insured State depository institution when appointed by a designated State official. *Id.* § 1821(c)(3). And the Comptroller of the Currency was still mandated to appoint the FDIC as a receiver under the National Bank Act. *See id.* § 191(a). The FIRREA largely "carried over" and consolidated "[m]any of the pre-FIRREA provisions governing the appointment of a conservator or a receiver." McCoy, *et al.*, 2 Banks & Thrifts: Gov't Enforcement & Receivership § 12.02. Like its predecessors, the Act mirrored the "rights and principles" governing receivers "established at common law or in bankruptcy." S. Rep. No. 101-19, 1st Sess. 314 (1989).[2]

### 5.    Dual Role of the FDIC

Under the statutory scheme now embodied in the FIRREA, "the FDIC plays two roles": as a corporation and as a receiver. *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 595 (D.C. Cir. 1994). "In its corporate capacity," the FDIC acts as an "insurer of deposits" and satisfies depositors' claims when an insured institution fails. *Id.*

In its capacity as a receiver, the FDIC "steps into the shoes" of the failed institution and takes possession of its assets and liabilities. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (quoting *Coit*, 489 U.S. at 585). The FDIC receiver thus "becomes to all intents and purposes the bank . . . after his appointment, [he] represents the bank, its stockholders and creditors." *Landy v.*

---

[1] Initially, Congress also established the Resolution Trust Corporation as a bridge institution that assumed the pre-FIRREA FSLIC receiverships during the crisis before handing off those powers to the FDIC in 1995. *See* Resolution Trust Corporation Completion Act, Pub L. No. 103–204, 107 Stat 2369 (1993).

[2] The FDIC receiver operates similarly under the FIRREA as it did under pre-FIRREA enactments. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (looking to FSLIC jurisprudence in examining receivership powers under FIRREA); *Landy v. FDIC*, 486 F.2d 139, 147 (3d Cir. 1973) (looking to National Bank Act jurisprudence to determine scope of FDIC's receivership powers); *Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.* (*Coit*), 489 U.S. 561, 568 (1989) (looking to National Bank Act jurisprudence to determine scope of FSLIC's receivership powers).

*FDIC*, 486 F.2d 139, 147 (3d Cir. 1973) (quoting *O'Connor v. Rhodes*, 79 F.2d 146, 148 (D.C. Cir. 1935)). The FDIC receiver must "marshal the assets of the bank and [] distribute them to the bank's creditors and shareholders." *E.I. du Pont de Nemours & Co.*, 32 F.3d at 595.

To accomplish this, the FDIC receiver "promptly publish[es] a notice to . . . creditors to present their claims, together with proof, to the receiver" by a specified date. 12 U.S.C. § 1821(d)(3)(B). Once a claim is submitted, the FDIC determines whether to allow or disallow it. *Id.* § 1821(d)(5)(A)(i). Adverse decisions are subject to judicial review within sixty days of disallowance. *Id.* § 1821(d)(6)(A). And any untimely claims are barred. *Id.* § 1821(d)(5)(C)(i). Once the bank's liability is determined, the FDIC receiver pays out the institution's liability-holders, creditors, and shareholders from the bank's proceeds using statutory priorities. *Id.* § 1821(d)(10)–(11). To marshal enough assets to satisfy the claims, "the FDIC may operate the institution, liquidate it, merge it with another insured bank, transfer some or all of its assets to another bank, create a new bank, or structure a transaction that combines two or more of those options." *E.I. du Pont de Nemours & Co.*, 32 F.3d at 595 (citing 12 U.S.C. § 1821(d)).

Thus, the FDIC's dual role becomes most acute during periods of bank insolvencies where it acts as "discrete legal entities." *FDIC v. Bernstein*, 944 F.2d 101, 106 (2d Cir. 1991) (citing *FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1109 (1st Cir. 1986)). In these circumstances, the FDIC in its corporate capacity "will disburse funds from the insurance fund to pay the accounts of insured depositors, purchase assets from the FDIC in its receivership or conservatorship capacities, and possibly, mak[e] assistance payments to buyers in purchase and assumption transactions" and "[u]pon payment of any of these various claims . . . make[] a claim against the receivership estate." Donald Resseguie, 2 Banks & Thrifts: Gov't Enforcement & Receivership § 11.02. Accordingly, the FDIC in its corporate capacity is often the largest creditor and claimant against the assets of

8

the FDIC receiver. *See id.*; *Coit*, 489 U.S. at 587. And the FDIC in its corporate capacity may purchase assets from the FDIC receiver as the FDIC receiver marshals the assets of a failed institution to satisfy creditors. *See E.I. du Pont de Nemours & Co.*, 32 F.3d at 595. In these circumstances, the FDIC must strictly adhere to its dual role to avoid any conflict of interest prejudicing the other creditors or shareholders of the depository institution. *See Landy*, 486 F.2d at 149.

### B.    Factual Background

The Court draws the facts, accepted as true, from the pleadings and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). The Court also takes "judicial notice of public records from other court proceedings." *Lewis v. Drug Enf't Admin.*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011).

Silicon Valley Bank was the largest regional commercial bank in the San Francisco Bay Area and offered services specifically designed to meet the needs of venture-backed tech startups. Am. Compl. ¶ 4, ECF No. 5. In a widely publicized incident, "[t]he Bank collapsed in March 2023 after customers withdrew more than $40 billion, resulting in a negative cash balance of $958 million at the close of business as of March 9, 2023." *In re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. 75, 82 (Bankr. S.D.N.Y. 2024). On March 10, 2023, the California Department of Financial Protection and Innovation shut down the Bank, and the FDIC was appointed as its receiver. Am. Compl. ¶ 4. On August 30, 2023, the City of New York completed audits of the Bank's municipal tax liability for the 2017-2018 and 2018-2021 tax years, finding a tax deficiency based on various adjustments for, among other things, interest reporting, receipts errors, and

dividends apportionment. Am. Compl. ¶¶ 20–24.[3] The City filed a claim with the FDIC receiver in the amount of $2,138,588.95 to recover the tax liability assessment—consisting of $1,442,664.96 in principal, $335,257.75 in interest, and $360,666.24 in penalties. Am. Compl. ¶ 27. On November 20, 2023, the FDIC receiver disallowed the City's tax deficiency claim "as not proven to the [receiver's] satisfaction." Am. Compl. ¶ 28.

### C.     Procedural Background

On January 18, 2024, the City filed this action to challenge the FDIC receiver's tax disallowance within the 60-day period provided for in the FIRREA. Compl., ECF No. 1. The City filed an Amended Complaint on April 16, 2024. Am. Compl. On August 13, 2024, the FDIC receiver filed amended tax returns with the City for the 2019-2021 tax years. Counterclaim ¶ 22, ECF No. 19. In these amended returns, the FDIC receiver carried back subsequent operating losses from the 2022 and 2023 tax years to its 2019-2021 tax liability. Counterclaim ¶ 23. The FDIC receiver now claims a tax refund from the City for the 2019-2021 tax period instead of a deficiency. Counterclaim ¶ 28. And the FDIC receiver responded to the City's Amended Complaint with a counterclaim for that refund. Answer, ECF No. 19. The City has moved to dismiss the FDIC receiver's counterclaim for lack of subject matter jurisdiction and failure to state a claim under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Mot., ECF No. 23-1. This motion is fully briefed and ripe for review. Opp'n, ECF No. 30; Reply, ECF No. 31.[4]

---

[3] "New York City imposes a banking corporation tax [] on every banking corporation doing business in New York City." *City of New York v. FDIC*, 40 F. Supp. 2d 153, 156 n.4 (S.D.N.Y. 1999).

[4] The FDIC receiver brought two additional counterclaims: (1) that 12 U.S.C. § 1821(d)(11) prevents the City from offsetting any claim for outstanding tax obligations asserted in the proof of claim that it submitted to the FDIC receiver; and (2) that the City may not collect penalties or interest under 12 U.S.C. § 1825(b)(3). Counterclaim ¶¶ 30–39. These counterclaims are not at issue here, as the City did not raise them in its motion. *See* Mot.; Opp'n 1 n.1 (noting that the City

**LEGAL STANDARD**

"A motion under Rule 12(b)(1) presents a threshold challenge to a court's [subject-matter] jurisdiction." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022) (cleaned up). The plaintiff "bears the burden of proving by a preponderance of the evidence that the Court has subject-matter jurisdiction over her claims." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 69 (D.D.C. 2011). When evaluating a motion under Rule 12(b)(1), "the court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Sandoval v. U.S. Dep't of Justice*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018).

Under Rule 12(b)(6), a court must dismiss a claim that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts "must construe the [pleadings] in favor of the [non-moving party], who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quotation omitted). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an "inference[] . . . unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted).

**DISCUSSION**

The City urges dismissal of the FDIC receiver's counterclaim, pointing to three bars to the Court's jurisdiction: the Tax Injunction Act, the comity doctrine, and the ongoing state audit procedures. The Court agrees that the Tax Injunction Act bars review of the FDIC receiver's counterclaim. So the Court grants the City's motion on that basis and declines to address the City's

---

did not address these counterclaims in its motion); Reply (not responding to Opposition on this point).

other grounds for dismissal. *See Levin v. Com. Energy, Inc.*, 560 U.S. 413, 432 (2010) (stressing a court's flexibility to choose among jurisdictional grounds in similar circumstances).

"[P]rinciples of federalism and comity generally counsel that [federal] courts should adopt a hands-off approach with respect to state tax administration." *Nat'l Priv. Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 586 (1995). After all, "[i]n our constitutional system, the power of the State to tax is a concurrent power." *Arkansas v. Farm Credit Servs.*, 520 U.S. 821, 826 (1997). "[T]he Tax Injunction Act [of] 1937 is one manifestation of" this hands-off approach. *Nat'l Priv. Truck*, 515 U.S. at 586. The Act provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The statute is understood to "divest[] the federal courts of jurisdiction to interfere with state tax administration." *California v. Grace Brethren Church*, 457 U.S. 393, 409 n.22 (1982); *see also Farm Credit Servs.*, 520 U.S. at 823, 825 (describing the Act as a "jurisdictional rule" and a "broad jurisdictional barrier" that "restricts the power of federal district courts to prevent collection or enforcement of state taxes"). It bars injunctions, "declaratory relief, and suits for damages as well." *Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir. 1999) (citation omitted). And it encompasses taxes "imposed by a state or municipal legislature." *McDonald v. Longley*, 4 F.4th 229, 242 (5th Cir. 2021) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1011 (5th Cir. 1998)).

The Parties dispute whether the FDIC receiver is subject to the Tax Injunction Act. The City argues that a straightforward reading of the statute divests this Court of jurisdiction. Mot. 10–11. The Court agrees. The FDIC receiver's counterclaim seeks a refund of the Bank's corporate business tax paid to the City. Counterclaim ¶¶ 25–29. The FDIC receiver argues that it is "entitled

to compute the [the Bank's taxes] for the 2019 through 2021 Tax Years by carrying back and deducting net operating losses incurred in the 2022 and 2023 Tax Years," which "results in tax liability less than [the Bank] reported and paid." Counterclaim ¶¶ 26–27. Even assuming that the FDIC receiver is correct that the Bank is entitled to a tax refund for the 2019–2021 tax period, this Court is prohibited from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The FDIC receiver has already submitted an amended tax return claiming a tax refund for 2019-2021, and that claimed refund is currently undergoing a routine audit by the City. Mot. 4–5. The FDIC receiver may also file a tax refund action with the New York City Tax Appeals Panel. *See* N.Y.C. Admin. Code § 11-680(3). In these circumstances, the Tax Injunction Act divests this Court of jurisdiction to entertain the FDIC receiver's counterclaim for a tax refund. 28 U.S.C. § 1341.

The FDIC receiver resists this conclusion by contending that the Act's jurisdictional bar is inapplicable (1) when a federal instrumentality sues to protect the interests of the United States, (2) in light of general grants of jurisdiction in the FIRREA and other related statutes, (3) because its counterclaim is compulsory under Federal Rule of Civil Procedure 13(a), (4) where there is a risk of numerous suits between the same parties, involving the same issues of law or fact, and (5) because the City waived reliance on the Tax Injunction Act. *See* Opp'n 3–14. Each of these arguments is unavailing.

### A.    Federal Instrumentality Exception

The FDIC receiver first argues that the Tax Injunction Act's federal instrumentality exception controls and confers jurisdiction on this Court. Opp'n 5–9. The Court disagrees.

Although the FDIC is statutorily designated as an "agency of the United States," 12 U.S.C. § 1819(b)(2), it is not a federal instrumentality for purposes of the Tax Injunction Act.

Although the Tax Injunction Act, "on its face, yields no exception to the jurisdictional bar save where the state remedy is wanting," the Supreme Court has established "at least one [] exception": "The statute does not constrain the power of federal courts if the United States sues to protect itself or its instrumentalities from state taxation." *Farm Credit Servs.*, 520 U.S. at 823–824. If the United States is not a party, courts have applied the exception when a federal instrumentality sues as an "'arm[] of the federal government'" to vindicate "interests indistinguishable from those of the sovereign," *id.* at 830 (cleaned up) (describing standard adopted by the First Circuit), or when an "institution is so closely r[e]lated to governmental activity as to become a tax-immune instrumentality" of the United States, *Dep't of Emp. v. United States*, 385 U.S. 355, 358–59 (1966).

The exception finds its roots in the canon "that the Government is not bound by its own legislative restrictions" unless the legislature's intent to do so is clearly expressed. *Farm Credit Servs.*, 520 U.S. at 827 (citing *Dollar Sav. Bank v. United States*, 86 U.S. (19 Wall.) 227, 239 (1873)). This reflects the "'rule of statutory construction' that 'if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.'" *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000) (quoting *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 65 (1989)). The "exception is an outgrowth" of the constitutional principle "set forth in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)," *FDIC v. New York*, 928 F.2d 56, 59 (2d Cir. 1991), "[t]hat the power to tax involves the power to destroy," *McCulloch*, 17 U.S. at 431,

14

and so "the federal government shall not be subject to taxation by the states," *New York*, 928 F.2d at 59.

Here, where the United States is not a party, the question is whether the FDIC receiver is a federal instrumentality that may invoke the exception to the Tax Injunction Act. The FDIC is a federal instrumentality for many purposes, *see Auction Co. America v. FDIC*, 132 F.3d 746, 749 (D.C. Cir. 1997), as it is statutorily designated as an "agency of the United States," 12 U.S.C. § 1819(b)(2). But this statutory designation does not resolve the question.

In *Arkansas v. Farm Credit Services of Central Arkansas*, the Supreme Court held that the federal instrumentality exception does not encompass all "instrumentalities of the United States." *Id.* at 825. There, the Court concluded that the exception did not apply to federally chartered farm lending associations even though they were statutorily designated as federal instrumentalities and exempt from state taxation. *Id.* at 824–25. The Court reasoned that it is "insufficient" that an instrumentality's "mission is defined and controlled by federal law and that [its] interests are the same as those of the United States." *Id.* at 829–30. Without endorsing a standard for when the exception applies, the Court held that the associations in question did not have "interests [] indistinguishable from those of the sovereign" as opposed to interests "analogous to [that of] private corporations." *Id.* at 830–31. Despite their statutory "designation" and lending powers, the Court found that they were not "arm[s] of the state" because they simply acted as "federally chartered corporation[s]" engaged in "commercial" or "economic" endeavors, not the exercise of sovereign authorities "coterminous with th[e] [interests] of the Government." *Id.* at 830–31.

Applying these principles, "[c]ourts differ on whether the FDIC qualifies for the exception" in its capacity as a receiver. *Bank of New England Old Colony, N.A. v. Clark*, 986 F.2d 600, 602 (1st Cir. 1993) (collecting cases). Two circuits have rejected the FDIC's broad reading of the

15

exception. The First Circuit has held that when the FDIC acts as a receiver, it is not a federal instrumentality under the Tax Injunction Act because: (1) the "FDIC's governmental role . . . is minimal" when it seeks a tax refund on behalf of a "private bank" and "not the federal government," (2) "no issues of intergovernmental tax immunity exist" when a state levies the taxes before the FDIC is appointed receiver, and (3) "if successful, the benefits from the refund claim will flow principally to the bank's creditors and depositors, not to the federal treasury." *Id.* at 603. And the Second Circuit similarly has held that challenges by the FDIC to "State and City[] tax assessments against banks" are not exempted from the Tax Injunction Act's jurisdictional bar because those challenges "protect commercial lending institutions rather than the federal government." *New York*, 928 F.2d at 59. The circuit reasoned that "[w]hile the FDIC surely has some interest in ensuring that federal banking laws are enforced" when acting as an assignee of a private bank's tax liability, this interest has a "*de minimis* effect on the federal government" and the FDIC's interests are mostly commercial. *Id.*[5]

The Third Circuit has adopted an intermediate approach. *Simon v. Cebrick*, 53 F.3d 17 (3d Cir. 1995). There, the FDIC removed and moved to dismiss a state tax foreclosure action brought during the pendency of the receivership as barred by the FIRREA. *Id.* at 19. The circuit held that the Tax Injunction Act did not divest it of jurisdiction, reasoning that the statute does not extend to tax foreclosure actions. *Id.* at 22. Alternatively, the circuit found that the FDIC would satisfy

---

[5] The FDIC tries to distinguish the Second Circuit's decision by noting that there the FDIC was acting as a contractual assignee rather than as a receiver of a private bank. Opp'n 8–9. But that is a distinction with little difference. The law has long treated a bank receiver as a "statutory assignee" of a financial institution, *Kennedy v. Gibson*, 75 U.S. (8 Wall.) 498, 506 (1869), who "stands no better than the bank" it seizes, *Deitrick v. Standard Sur. & Cas. Co. of New York*, 303 U.S. 471, 480–81 (1938) (quoting *Rankin v. City National Bank*, 208 U.S. 541, 546 (1908)). *See Davis v. Brown*, 94 U.S. 423, 427 (1876) ("The receiver has . . . no greater right than the bank has: he stands in its shoes.").

the federal instrumentality exception because it was challenging an "unconstitutional state exaction[]" against the receiver itself that was barred by FIRREA. *Id.* at 23 (citation omitted). The circuit distinguished these "particular circumstances" from those in *Clark* in the First Circuit or *New York* in the Second Circuit, where the taxes were initially levied against private banks prior to receivership, the actions were largely governed by state law, and thus "the FDIC's governmental role was minimal." *Id.* at 22–23.

Only the Fifth Circuit has held that the FDIC receiver generally acts as a federal instrumentality for purposes of the Tax Injunction Act. *See FDIC v. City of New Iberia*, 921 F.2d 610, 613 (5th Cir. 1991). The circuit addressed the question *sua sponte* without briefing from the parties and summarily concluded that the FDIC is a "federal agenc[y] exempt from the operation of" the Tax Injunction Act. *Id.*

The Court is persuaded that the FDIC receiver does not satisfy the federal instrumentality exception when bringing a tax refund claim against a state or municipality in the manner presented in this case. The inquiry is whether the FDIC's interests as a receiver are "coterminous with those of the Government." *Farm Credit Servs.*, 520 U.S. at 831. They are not.

The FIRREA provides that the FDIC receiver "succeed[s] to . . . all rights, titles, powers, and privileges of the insured depository institution." 12 U.S.C. § 1821(d)(2)(A)(i). In this capacity, the FDIC receiver will:

> (i) take over the assets of and operate the insured depository institution with all the powers of the members or shareholders, the directors, and the officers of the institution and conduct all business of the institution;
>
> (ii) collect all obligations and money due the institution;
>
> (iii) perform all functions of the institution in the name of the institution which are consistent with the appointment as conservator or receiver; and
>
> (iv) preserve and conserve the assets and property of such institution.

17

*Id.* § 1821(d)(2)(B).

This statutory language "indicate[s] that the FDIC as receiver 'steps into the shoes' of the" bank put under receivership. *O'Melveny & Myers*, 512 U.S. at 86 (quoting *Coit*, 489 U.S. at 585). This principle of receivership dates back to the National Bank Act of 1864. *See Davis v. Brown*, 94 U.S. 423, 427 (1876) (noting the receiver "stands in [the bank's] shoes"); *Sekhar v. United States*, 570 U.S. 729, 733 (2013) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (citation omitted)). "When it step[s] into these shoes," the FDIC "shed[s] its government character and bec[omes] a private party." *Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017) (cleaned up) (describing identical language in a similar statutory scheme). The FDIC receiver is for "all intents and purposes the bank—at least [it] stands in [its] place." *O'Connor*, 79 F.2d at 148. And its "responsibility" is to the bank, its shareholders, and its creditors—*i.e.*, "to marshal the assets of the bank and to distribute them." *E.I. du Pont de Nemours & Co.*, 32 F.3d at 595.

Indeed, prior to the requirement that the FDIC serve as a receiver for failed banks, it was well established that the receiver "represents the bank, its stockholders, its creditors, and does not in any sense represent the government." *Case v. Terrell*, 78 U.S. 199, 202 (1870). This was true even though the receiver was an "agent and officer of the United States." *Chetwood*, 165 U.S. at 458. None of this changed when Congress transferred the receivership functions to the FDIC. *See Coit*, 489 U.S. at 568, 576, 583–85 (looking at Bank Act jurisprudence to determine scope of authority of FSLIC receiver). When "the FDIC is acting only as a receiver of a failed institution," it steps into the shoes of the private institution and "is not pursuing the interest of the Federal Government as a bank insurer." *Atherton*, 519 U.S. at 225.

18

Simply put, "the FDIC is not the United States," and as the receiver of Silicon Valley Bank, it is not asserting its own rights but those of the Bank. *See O'Melveny & Myers*, 512 U.S. at 85. Indeed, the FIRREA provides that the FDIC receiver "shall not be subject to the direction or supervision of any other agency or department of the United States or any State in the exercise of its rights, powers, and privileges." 12 U.S.C. § 1821(c)(2)(C). When acting as a receiver, the FDIC's "interests are not coterminous with those of the Government any more than most commercial interests." *Farm Credit Servs.*, 520 U.S. at 831. Thus, the FDIC receiver cannot invoke the federal instrumentality exception to the Tax Injunction Act in this suit.

### B.    FIRREA and Related Statutes

The FDIC receiver next argues that general grants of jurisdiction in the FIRREA and other related statutes vest this Court with jurisdiction over its counterclaim notwithstanding the Tax Injunction Act's jurisdictional bar. Opp'n 4–5. Not so.

The FIRREA provides that "suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States" and permits federal removal. 12 U.S.C. § 1819(b)(2)(A)–(B). But as the City points out, that provision does not apply to any action: (1) concerning preclosing rights against (2) the FDIC when appointed by a State official as receiver of a State insured depository institution (3) "in which only the interpretation of the law of [a] State is necessary." *Id.* § 1819(b)(2)(D); Reply 15. The Court agrees that this exception applies, as this case concerns preclosing state taxation of a state-chartered bank that was put into FDIC receivership by California officials. *See In re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. at 82, 90. So FIRREA's general arising under grant does not help the FDIC receiver.

The FDIC receiver also invokes the general grant of jurisdiction in 28 U.S.C. § 1345 and 12 U.S.C. § 1819(b)(1) for FDIC actions as suits by an agency of the United States. But these provisions do not override the Tax Injunction Act. The existence of a general jurisdictional statute does not "itself . . . exempt[]" an instrumentality from the Tax Injunction Act's jurisdictional bar. *Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.*, 425 U.S. 463, 472 (1976). To carve out an exception to the Act, a statute must provide a "clear and manifest" indication of congressional intent, *Clark*, 986 F.2d at 604, "to interfere with so important a local concern as the collection of taxes," *Grace Brethren Church*, 457 U.S. at 408–09 (quoting *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 522 (1981)).

Neither of these statutory schemes does that; they merely confer general "arising under" or agency jurisdiction. This does not evince congressional intent to disturb the careful balance the Tax Injunction Act strikes with respect to federal-state relations. *See* 12 U.S.C. § 1819(b)(1)–(2); 28 U.S.C. § 1345. It is no surprise, then, that nearly every circuit that has addressed this argument has rejected it. *See Clark*, 986 F.2d at 604 ("The structure of § 1819(b) does not demonstrate a clear and manifest intent to override the [Tax Injunction] Act."); *Simon*, 53 F.3d at 22 ("We . . . reject the FDIC's reliance on FIRREA's removal provision.").

### C.    Federal Rule of Civil Procedure 13(a)

Next, the FDIC receiver argues that its counterclaim is compulsory under Federal Rule of Civil Procedure 13(a), so the Court must exercise supplemental jurisdiction over it. Opp'n 10 (citing *American Fed'n of Musicians v. Stein*, 213 F.2d 679, 686 (6th Cir. 1954)). The Parties dispute whether the FDIC receiver's counterclaim is truly compulsory. *See* Reply 9. Regardless, the Tax Injunction Act is a "jurisdictional bar," *Farm Credit Servs.*, 520 U.S. at 823, and the Federal Rules of Civil Procedure "do not extend . . . the jurisdiction of the district courts," Fed. R.

20

Civ. P. 82. "Consequently, it would be improper to use an overly broad application of Rule 13 to justify the expansion of federal subject-matter jurisdiction[.]" Charles A. Wright and Arthur R. Miller, 6 Fed. Prac. & Proc. Civ. § 1414 (3d ed. Sep. 2025 Update). "[I]f [a] counterclaim is entirely beyond the competence of the federal courts, . . . the court may not adjudicate it even if the claim would otherwise be treated as compulsory." *Id.* Thus, Rule 13 is not a basis for the Court to disregard the Tax Injunction Act. *See City of Houston v. Standard-Triumph Motor Co.*, 347 F.2d 194, 201 (5th Cir. 1965). And the general jurisdictional grant of supplemental jurisdiction, 28 U.S. Code § 1367, does not alter this result. *See Moe*, 425 U.S. at 472 (recognizing a jurisdictional statute is insufficient by itself to establish an implied repeal of the Tax Injunction Act).

### D.      Multiplicity of Suits Exception

The FDIC receiver also briefly relies on the multiplicity of suits exception to the Tax Injunction Act, Opp'n 9, under which the Court may exercise jurisdiction in "extraordinary circumstances . . . . where there is a real risk of numerous suits between the same parties, involving the same issues of law or fact," *Nat'l Priv. Truck*, 515 U.S. at 591 n.6 (cleaned up). But that exception applies only to claims for "injunctive or declaratory relief." *Id.* And the FDIC receiver's counterclaim is for monetary damages. *See* Counterclaim ¶¶ 25–29. So this exception is not implicated here.

### E.      Waiver

Finally, the FDIC receiver makes a halfhearted attempt to argue that the City waived its ability to challenge this Court's jurisdiction by filing this action. *See* Opp'n 10. This argument is tenuous considering that the FDIC receiver did not file the amended tax return underlying the counterclaim until after the City commenced this suit. But regardless, the Supreme Court has held that the Tax Injunction Act bars suit even if the "State [affirmatively] argue[s] in favor of the

federal court's jurisdiction." *Farm Credit Servs.*, 520 U.S. at 826. Thus, this argument also fails out of the gate.

*    *    *

For these reasons, the FDIC receiver is barred from bringing its counterclaim against the City for "[p]ayment of its Tax Refund." Counterclaim ¶¶ 25–29. Still, the FDIC receiver may rely on its entitlement to a tax refund to contest the City's disallowance claim under the FIRREA. The Tax Injunction Act does not prevent a party from raising defenses in "suits brought by a government to obtain collection of a tax." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 435 (1999). But importantly, this exception is limited only to "defenses"—not the affirmative counterclaim and corresponding damages award that the FDIC receiver is seeking here. *Id.* The FDIC receiver has already raised its entitlement to an operating loss deduction as an affirmative defense in its Answer to the Amended Complaint. *See* Answer 8 (Seventh Affirmative Defense). This is permissible. But the FDIC receiver's counterclaim is not.

**CONCLUSION**

For these reasons, the Court grants the City's Motion to Dismiss the Counterclaim, ECF No. 23.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date:    March 27, 2026

22